GRAHAM ET AL., APPELLANTS, *v.* CROSAS ET AL., RESPONDENTS.

APPEAL from the District Court of San Juan, Section 1.

No. 652.—Decided March 5, 1913.

APPEAL—ASSIGNMENT OF ERROR.—When in alleging as one of the grounds of the appeal that the court erred in weighing the evidence no specific legal question is raised but said question is reserved to be taken up with the other errors in the judgment appealed from, this court cannot consider separately an error alleged in this manner.

SIMULATED CONTRACTS.—It has not been proved in this case that the deed whereby Rafael Margari sold to Andrés Crosas his interest in the firm of Margari & Co., in liquidation, was simulated, for it witnesses an act which is in accord with the real facts.

ID.—CONVEYANCE.—Nor has it been shown that the deeds whereby Rafael Margari sold to the commercial firm of Crosas & Finlay, represented by the managing partner, Andrés Crosas, three lots numbered 6, 11, and 12, situated in the

*barrio* Marina of this city, were simulated or null and void, for although said lots appeared in the name of Rafael Margari, they belonged to Margari & Co., and therefore there was no legal obstacle to their conveyance by Rafael Margari directly to Crosas & Finlay, instead of conveying them to Margari & Co. so that the firm might in turn convey the same to Crosas & Finlay.

ATTORNEY IN FACT—WILL—POSTHUMOUS CHILD—GUARDIAN.—When one person appoints another his attorney in fact to execute a will in his name in accordance with Law 31 of Toro, or Law 1, title 19, book 10 of the *Novisima Recopilación*, and at the same time appoints him guardian and curator *ad bona* of a son, the attorney in fact cannot extend the appointment to include a posthumous daughter of his principal when it does not appear from the power of attorney that he was given that power.

GUARDIAN—PARTITION OF INHERITANCE.—The nullity of the appointment of a guardian and curator *ad bona* who does not take part as, such in the partition of the property of the deceased does not affect the validity of the partition.

ID.—In a case where the guardian was not required to give bond and was allowed to use the minor's income for his support, it was unnecessary to comply with the provisions of article 1261 of the Spanish Code of Civil Procedure of 1855 before qualifying

ID.—SECURITY FOR FAITHFUL DISCHARGE OF DUTIES.—The failure of the guardian to give security for the faithful discharge of his duties is not a material defect such as to render his qualification null and void, nor does it relieve him of the responsibility attaching to the guardianship.

GUARDIAN AD LITEM—CONFLICTING INTERESTS—PARTITION OF INHERITANCE.—In accordance with the provisions of article 1852 of the Code of Civil Procedure which went into effect in Porto Rico on January 1, 1886, when the guardian cannot represent the minors in a partition of property because of conflicting interests, it was proper to appoint a guardian *ad litem*.

ID.—OBJECTIONS—PARTITION OF INHERITANCE.—It is too late to object to the qualification of a guardian *ad litem* after he has discharged the duties thereof and has ceased to act in that capacity after the partition of the estate has been approved; furthermore, the objection is not legal when made without hearing the interested party.

POWER OF ATTORNEY — TESTAMENTARY PROCEEDINGS — PARTITION OF INHERITANCE.—A power of attorney executed in favor of a person authorizing him to take all the necessary legal steps in testámentary proceedings and generally to perform all acts and proceedings in connection therewith up to the termination of said testamentary proceedings, includes sufficient power to authorize the partition of the estate extrajudicially when the acts of his principal reveal such an intention on his part.

PARTITION OF INHERITANCE—AGREEMENTS.—Agreements made in the partition of an estate judicially approved is law for the interested parties duly represented therein.

PARTNERSHIP—LIQUIDATION—GUARDIAN AD LITEM—MINORS.—When in the liquidation of a commercial partnership the minors interested therein and duly represented by a guardian *ad litem* are prejudiced by the liquidation, they have the right to proceed against the guardian either before or after reaching their majority, in accordance with the provisions of article 234 of the Code of Commerce.

PARTITION OF INHERITANCE—NEGLIGENCE OF EXECUTOR—RIGHT OF ACTION—UN-
COLLECTABLE ACCOUNTS.—Where by reason of the negligence of an executor
an account becomes uncollectable, such negligence may constitute grounds for
an action against said executor, but does not affect the validity of the parti-
tion of the inheritance wherein the account appears.

PRESCRIPTION—ACTIONS—NULLITY OF CONTRACTS—RESCISSION OF PARTITION—
MINORS.—In accordance with the provisions of section 1268 of the Revised
Civil Code, which is a reproduction of article 1301 of the old Civil Code,
actions for the annulment of contracts in the cases referred to in said section
lie for four years only, and this period with respect to minors begins to run
when they reach their majority. This period of prescription is the same for
actions to rescind partitions of inheritance.

The facts are stated in the opinion.

*Mr. Antonio Sarmiento* for appellants.

*Mr. Juan Hernández López* for respondents.

MR. CHIEF JUSTICE HERNÁNDEZ delivered the opinion of the
court.

On November 14, 1908, the plaintiffs, Elena Graham
O'Brien, Andrés B. Crosas Graham and Eduarda Crosas Gra-
ham, composing the Succession of Eduardo E. Crosas O'Fer-
ral, brought an action in the District Court of San Juan
against Andrés Crosas O'Ferral and Rafael Margari, and
after setting forth in their complaint such facts as in their
opinion were necessary, prayed the court as follows:

"The court is prayed to render judgment against the defendants,
decreeing null and void: (1) the sale by Rafael Margari to Andrés
Crosas O'Ferral of the former's share in the liquidation of Margari &
Co. and the sale by the same to Crosas & Finlay of lots Nos. 6, 11 and 12
situated in the Marina of this city; (2) the appointment of Andrés
Crosas as tutor and guardian *ad bona* of Eduarda Crosas Graham;
(3) the appointment of said Crosas as tutor and guardian *ad bona*
of Andrés Bernardino Crosas Graham; (4) the appointment of
Benigno Trueba as curator of said minors; (5) the division of the
estate left by Eduardo E. Crosas made by the said Andrés Crosas
as executor with the approval of Miguel Sainz and Benigno Trueba,
dissolving the commonalty of property between Andrés Crosas O'Fer-
ral and the Sucession of Eduardo Crosas O'Ferral resulting from
the liquidation of Margari & Co., and ordering: (1) that said dis-
solution of the commonalty of property be carried into effect in
accordance with the law governing partitions; (2) the cancellation

of the records made in the registry of property of the transfers to Crosas & Finlay of the title to lots Nos. 6, 11 and 12 situated in the Marina of San Juan and from said Crosas & Finlay to Andrés Crosas; (3) that the executor and administrator of the estate left by Eduardo E. Crosas render an accounting to date of his administration and that he make a partition of said inheritance, including not only such properties as are now in his possession but also those which may have been legally substituted for them or a cash valuation of those properties whose substitution may be legally impossible; (4) that upon securing the approval of the parties in interest to said partition he deliver to each his allotted share in the inheritance, executing to each the proper title; (5) that the defendants pay the costs of this suit.''

In their answer the defendants made a general and specific denial of the essential allegations of the complaint in so far as they are opposed directly or indirectly to the facts specifically alleged by them, both of the defendants beginning their pleadings with a demurrer on the grounds that the plaintiffs had no cause of action, and that even supposing they had, such right of action had prescribed according to sections 1266 and 1268 of the Civil Code of Porto Rico in connection with the corresponding sections of the Spanish Civil Code and of the Spanish civil laws formerly in force, it being well understood that the time for prescription as regards Andrés and Eduarda Crosas y Graham should be counted from the time they attained their majority and as regards Elena Graham from the date of the acts and contracts whose rescission or nullity is sought.

The trial having been had, the court rendered judgment on May 24, 1910, declaring: ''That the inventory, appraisement and partition of the estate of Eduardo Crosas O'Ferral made in 1887 are valid, as they contain no defects rendering them void; that the heirs have received their inheritance according to law; that the other contracts referred to in the complaint made prior to and in connection with said partition are also valid and that the plaintiffs have no right to claim anything from Andrés Crosas and Rafael Margari.

This judgment is rendered without any special imposition of costs."

Counsel for the plaintiffs took an appeal from this judgment to this court and the same is now before us for consideration and decision.

In his brief the party appellant maintains that the judgment should be reversed on the ground that the following errors, upon which the appeal is based, have been committed:

*First.* That it is contrary to both the *prima facie* and conclusive evidence, consisting of public documents, private documents acknowledged or accepted by the party prejudiced thereby, and to the confession made by one of the parties to the suit.

*Second.* That it decrees as valid public instruments relating to unperformed contracts and consequently does not order the cancellation in the registry of property of the records of said instruments and of others growing out of them.

*Third.* That it decrees as valid the appointment of a testamentary guardian made by an attorney in fact who had no authority to make the appointment.

*Fourth.* That it decrees the validity of the qualification of the guardian *ad bona* without security and with the disposition of the income, without first requiring a report upon the property of the minor and its conditions, without hearing the *fiscal*, without the sanction of the court to the exercise of the guardianship under these conditions and without security from the guardian for the faithful performance of his duties.

*Fifth.* That it declares valid the appointment and qualification of a guardian *ad litem* to substitute the incompatibility of the guardian *ad bona* referred to in the assignment of errors hereinbefore recited.

*Sixth.* That it decrees as valid the partition of an inheritance which was not lawfully approved by the interested parties and which was founded upon false premises and consequently does not order a new partition after an accounting by the executor and administrator, and that after the ap-

proval of said accounting and partition by the parties interested in the inheritance, he should deliver to the latter their respective shares and execute to them the proper notarial instruments.

*Seventh.* That it omits to decree the dissolution of the community ownership solicited by one of the joint owners, and as a result no such declaration is made or ordered entered.

In relation to the errors assigned, we have deduced from the documents introduced during the trial the facts which now follow in separate and numbered paragraphs in order to consider them in connection with other facts and to decide the questions raised according to law.

1. By a public, instrument of December 1, 1873, Rafael Margari and Andrés Crosas O'Ferral formed a mercantile partnership in this city of San Juan under the firm name of Margari & Co. to continue for a period of two years for the purpose of engaging in the cooperage business as a manufacturing enterprise and the corresponding commercial business. Each partner contributed 10,000 *pesos* and it was agreed that each should use the firm name and be entitled to an allowance of 150 *pesos* per month for his private expenses to be deducted from his share of the profits of the business, which were to be divided equally between them. The contract further provided that upon the death of one of the partners the surviving partner should continue in charge of the business until the expiration of the time fixed and liquidate the partnership alone, paying over to the heirs the amount coming to them after said liquidation. According to a private instrument, on the same date that the partnership was formed Eduardo E. Crosas was admitted as managing partner with the same amount of capital as was contributed by each of the other two partners, 10,000 *pesos.*

2. By another public instrument, dated December 1, 1876, Rafael Margari, Andrés Crosas and Eduardo E. Crosas extended the partnership of Margari & Co. two years more, or

until November 30, 1877, and ratified all the clauses of the original contract of December 1, 1873, with the only exception that instead of 150 *pesos* each partner was to draw 200 *pesos* per month for his private expenses. In the new contract the statement was expressly made that upon becoming a member of Margari & Co. Eduardo E. Crosas did not add his name to the firm in the articles of co-partnership for reasons which it was not necessary to state, but that he was subject to the conditions of the contract and ratified all the transactions shown on the books of the firm to which he had duly contributed the sum of 10,000 *pesos*.

3. Eduardo E. Crosas O'Ferral died on November 8, 1877, and four days before his death he conferred upon his brother, Andrés B. Crosas O'Ferral, the power to make his will in his name, the terms used by him therefor being as follows:

"By these presents and after due consideration he confers upon his brother, Andrés Crosas, resident of this city, the most absolute, full and complete power of attorney, to do and perform every act and thing requisite and necessary to be done for the purpose of executing his last will and testament according to the instructions which he has already received and such others as may hereafter be given him if necessary, and to make therein the inventory of his property, and a statement of his debts, legacies and bequests according to said instructions, which power is given him without any restriction on account of the unlimited confidence which he merits, to accomplish which he is given all the time he needs should he be unable to finish within the four months provided by law, reserving to himself the following:"

Here follow two clauses regarding religious matters and pious legacies, and then the document continues:

"*Third.* He is ordered to declare that his principal is lawfully married to Elena Graham from which marriage there is only one child now about six months old whose name is Andrés Bernardino Crosas. And whereas this child is now a minor, in view of the confidence which his said brother, Andrés Crosas, merits and in order that he together with the child's mother may take zealous

and efficient care of the person and property of the child, he hereby appoints his said brother as tutor and guardian *ad bona,* releasing him from furnishing security and granting him the income of the minor for its maintenance and education and praying the courts to whom this clause may be submitted to accept the same and give it judicial approval.

"*Fourth.* He is directed to make the inventory of his properties and of debts due by and to him which shall be respected by the heirs, and no persons, even those who may have a lawful right, shall contest this clause, as he now once and for all approves, ratifies and confirms every part thereof.

"*Fifth.* As a duty and as a token of the sincere affection which I have for my mother, María L. O'Ferral, I bequeath to her one-fifth of my net estate, and availing myself of the right given me by law and for the reasons above given, I devise to her by right of inheritance, or as may be best in law, one-sixth of my property to be enjoyed by her at will.

"*Sixth.* He appoints his brother Andrés as his sole executor so that he may carry out the provisions of this power and of the will to be made in virtue hereof, giving him full power and all the time he needs to act within or beyond the period fixed by law, ordering that he proceed extrajudicially and not otherwise in making his last will and testament until its completion and approval, when he shall take charge freely of the administration of the properties and the guardianship of his only heir with the power to sell such properties as may be necessary and to execute the public instruments required.

"*Seventh.* And that having carried out all these instructions and paid off all debts, he is hereby ordered to appoint his said son, Andrés Bernardino Crosas, as well as any other children who may be born of his marriage, as sole and universal heir to the remainder of his estate, rights and actions, both present and future, so that after everything necessary has been completed they may enjoy it in peace with the blessings of God and his own."

4. Upon the dissolution of the partnership of Margari & Co., which took place on November 30, 1877, the period for which it was formed having expired, an inventory and general balance were made, in which the assets of $92,764, included $14,419.18 cash and lots Nos. 6, 11, 12 and 16, situated in *barrio* Marina of this city and valued at $3,232.98,

$2,913.50, $2,790.20 and $250, respectively. The liabilities amounted to $62,778.38, in which Rafael Margari, Andrés Crosas and E. E. Crosas appeared as creditors in the investment account for the sum of $16,799.82, leaving a net profit of $29,985.62, from which sum $2,737.22 should be deducted as due to the Government on account of said lots, less $103 representing the amount of various receipts for rent of buildings on said lots, leaving a total of $27,351.40 for distribution among the partners, or $9,117.13 each.

5. By a public deed executed December 15, 1877, Rafael Margari sold to Andrés Crosas his interest in the firm of Margari & Co. in liquidation, which interest, according to the inventory and general balance made on the first of the same month amounted to $25,916.97, as follows: His capital of $16,799.84 and one-third of the profits, amounting to $9,117.13. The sale was made for $21,000, foreign gold, $20,742 of which was paid in cash and the balance of $258 in the value of lot No. 16. The statement is made in this instrument by the parties thereto that Margari sold to Andrés Crosas on November 30 last his entire interest in the stock, real property and other effects which he had in the firm of Margari & Co. and his interest in lots Nos. 6, 11 and 12, keeping only lot No. 16 at its purchase price value of $258.

6. By another public deed, executed December 18, 1877, Andrés Crosas and Jorge Isidoro Finlay formed a mercantile partnership for a period of two years under the firm name of Crosas & Finlay, of which both were managing partners, the business in which they were to engage being commercial cooperage and its corresponding transactions, wholesale and retail, each partner contributing the sum of $15,000 to the partnership.

7. There was published in the *Official Gazette* of December 20, 1877, a circular letter bearing date of the day before, in which Margari & Co., in liquidation, announced that from that day on they had ceased doing business on account of having sold out the entire business to Andrés Crosas, the

liquidation of the firm being continued by Crosas, as per circular appearing on the reverse side. In the circular on the reverse side Crosas & Finlay made the announcement that on the same date they had formed a commercial partnership under the firm name of Crosas & Finlay for the purpose of engaging in the business of its predecessors, of the liquidation of which they had taken charge, Andrés Crosas and Jorge I. Finlay being the only managing partners.

8. In a public deed executed May 25, 1878, Fernando M. Cesteros y Mangual, for and on behalf of the agricultural firm of Skerret Bros. & Co., of which he was managing partner, acknowledged that from July, 1877, to the date of the instrument his firm had received from the merchant, Eduardo Crosas, and afterwards from his heirs and successors, several sums of money, amounting to $30,186.82, foreign gold, which money was furnished for financing the cultivation and improvement of plantations "Monserrate," "Julita" and "Carmela" or "Ortega," and that upon demand by the executor of the estate of Eduardo Crosas the firm had acknowledged that it owed the above-mentioned sum to the said estate, promising to pay the same with the profits from the crops of 1878 and 1879 as the products from the three plantations were sold and agreeing to pay interest on the deferred payments at the rate of 1 per cent per month, beginning March 10, 1878, the security given for said payment being a tacit mortgage on said plantations together with all the products, machinery, lands, crops, oxen and other appurtenances. This deed was approved by Andrés Crosas in his character of executor as correct in all its parts.

9. By three public instruments, one of which was executed on April 28, 1880, and the others on the 29th of the same month, Rafael Margari y Báez sold to the firm of Crosas & Finlay, represented by its managing partner, Andrés Crosas, three lots, Nos. 6, 11 and 12, situated in *barrio* Marina of this city, which lots Margari had purchased at a public sale held by the *Junta de Almoneda* of the Treasury Department

on November 29, 1875, for the same price that Margari had paid for them, the amounts which Margari had already paid to the Government being returned to him and Crosas & Finlay agreeing to pay the instalments still due the Government thereon.

10. On January 14, 1881, Andrés Crosas, in compliance with the power conferred upon him by his brother Eduardo on November 4, 1887, executed the will, the third clause of which is as follows:

"According to the third clause of the power of attorney he was ordered to declare that his said brother was lawfully married to Elena Graham from which marriage there was only one child named Andrés Bernardino Crosas y Graham; but inasmuch as at the time of the death of his principal, Eduardo, his wife was then *enceinte,* although this fact was not mentioned in the power of attorney, it being, however, a positive fact, the party executing this instrument, in the exercise of the powers with which he is vested hereby declares that the said Elena Graham gave birth later to a child which was given the name of Eduarda; therefore this child should be considered and acknowledged as the legitimate child of his said brother Eduardo for all lawful purposes as an offspring of his marriage to Elena Graham born viable; and whereas the deceased, his principal, appointed him, Andrés Crosas y O'Ferral, as guardian and curator *ad bona* of his other legitimate child, Andrés Bernardino Crosas y Graham, in compliance with the express will of his principal and in pursuance of the positive instructions which he received in connection with this circumstance, he extends that appointment to his other child, Eduarda Crosas y Graham, also without giving security and with the use of her income for her support and education."

In the fourth clause he declares that the properties of his deceased brother Eduardo consist of the following:

"(1) A lot in the first zone of Puerta de Tierra of this city upon which there are two huts of straw and wood in bad condition; (2) an obligation set forth in a public instrument executed in favor of Eduardo by the firm of Skerret Bros. & Co. for supplying funds for the running expenses of plantations Monserrate, Julita and Carmela, the first two situated at Dorado, the obligation being for

30,186.82 *pesos,* current money; ` (3) his interest in the liquidation of the firm of Margari & Co. as set forth in the public partnership contract, which liquidation is in the hands of Andrés Crosas and which, according to a general balance struck on November 30, 1877, amounts to 25,916 *pesos* as the share of Eduardo; (4) a promissory note for 2,500 *pesos* signed by Manuel Barasoaín and his wife, Juana Colón, dated September 5, 1876.''

In the fifth clause of the will one-fifth and one-sixth of the estate is left to María L. O'Ferral, Eduardo's mother. In the sixth clause Andrés Crosas is appointed Eduardo's executor. In the seventh clause another fifth of the property is left to Elena Graham in usufruct, which is to pass to the heirs of Eduardo after the death of Elena. In the eighth clause Andrés Bernardino and Eduarda Crosas y Graham are designated as the heirs according to the instructions given by Eduardo Crosas.

11. On May 20, 1881, Andrés Crosas, as tutor and testamentary guardian of the minors, Andrés Bernardino and Eduarda Crosas y Graham, presented a petition to the *Juzgado de Primera Instancia* of the Cathedral District of San Juan, asking for permission to present evidence to show the necessity and utility of disposing of the mortgage credit of $30,186.82 held against the firm of Skerret Bros. & Co. as set forth in the public instrument executed May 25, 1878, and further asking the court to confirm him as tutor and guardian of said minors. The petition was granted by the court on the 28th of the said month of May, on which day Crosas was confirmed as tutor of said minors without giving bond and with the right to use the income of said minors for their support and education. The evidence having been heard as requested by Crosas, by a decree of June 10 following the court allowed Crosas, as tutor of the minors Andrés and Eduarda Crosas y Graham, to proceed to sell the said mortgage credit, the object of which was to acquire property yielding a larger income, said permission to sell being given with the express understanding that the sale should be made at public auc-

tion. The auction was held and the sale was made to Nicolás Ordaz, which sale was approved on August 12, 1881, after which, or on September 5 following, according to a document signed by Andrés Crosas, Nicolás Ordaz and the clerk of the court, José María San Juan, said Ordaz paid to Crosas the sum of $30,686.82, Mexican silver, the purchase price of the credit, the receipt of which was acknowledged by Crosas. Although this document states that it is signed by the judge, his signature does not appear.

12. By a public deed of July 14, 1881, Fernando M. Cesteros, as managing partner of Skerret Bros. & Co., sold to Andrés Crosas a farm property located in the district of Río Grande, in *barrio* Herrera, called "Los Cocos," composed of 631.83 *cuerdas* and having upon it a two-story frame house. The purchase price was $15,000, current money, which the vendor acknowledged to have received beforehand.

13. By another public deed of December 22, 1883, said Andrés Crosas sold to Carlos and Emilio Just y Jensen the same farm called "Cocos" which he had bought from Skerret Bros. & Co. on July 14, 1881, for the sum of $25,000, foreign money. The vendor acknowledged receipt of $6,000 from the vendees and the balance of $19,000 was to be paid in six separate instalments to become due on the 22d of December of the years 1886 to 1891, inclusive, the first, fourth, fifth and sixth instalments being for $3,000 each and the second and third for $3,500 each, a mortgage being imposed upon the property to guarantee the payment of all of said instalments.

14. In an instrument containing the partition of the estate of Nicolás Ordaz, executed on June 18, 1883, it appears that in the fifth clause of his will Ordaz declared as a part of his property two claims against the firm of Skerret Bros. & Co., for the collection of which he had instituted executory proceedings, in which proceedings execution had issued in his favor before his death. These proceedings were continued by Isabel Sampayo as the representative of the Succession of

Ordaz and by due process of law the properties levied on, among which were the plantations "Monserrate," "Carmelita" and "Julita," were adjudicated to her to satisfy said claims. This same instrument shows further that during the married life of Isabel Sampayo and Nicolás Ordaz a number of debts were contracted, many of which were still outstanding at the time of the death of Ordaz, prominent among them being a debt in favor of Andrés Crosas amounting to $12,525, representing the value of an obligation acquired by Nicolás Ordaz, the credits of Crosas & Finlay and of Carolina Skerret, this latter amounting to $25,000, the aggregate of all the debts being $136,868.56, which had to be deducted from the amount of the estate left and the payment of which was taken charge of by Isabel Sampayo, for which purpose she was awarded the plantations Carmelita and Julita with their buildings and a portion of the total value of the lands, machinery, buildings, fixtures and appliances of the plantation Monserrate.

15. By a public instrument executed on August 31, 1883, Isabel Sampayo, widow of Nicolás Ordaz, assigned to Andrés Crosas a tract of 100 *cuerdas* of the plantation Julita in payment of the debt amounting to $12,523 mentioned in the will of Nicolás Ordaz and which, according to the instrument, originated from the assignment made to the deceased by Andrés Crosas of a note of Skerret Bros. & Co. of which Crosas acknowledged to have received payment to his entire satisfaction.

16. On August 15, 1886, Andrés Crosas and Miguel Sainz instituted possessory title proceedings in the *Juzgado de Primera Instancia* of the San Francisco District of San Juan, for houses Nos. 40 Sol Street and 8 San José Street of this city, two-thirds of which properties belonged to Andrés Crosas by inheritance from his father, Bernardino Crosas, and one-third to Miguel Sainz by inheritance from his son Bernardino, both Crosas and Sainz stating that they were the only components of the Succession of Bernardino Crosas.

Their possessory title having been established, the proceedings were approved by a decree of September 26, 1886.

17. On April 29, 1887, Andrés Crosas petitioned the *Juzgado de Primera Instancia* of the Cathedral District to appoint a curator *ad litem* to represent the minors, Andrés Bernardino and Eduarda Crosas, in the extrajudicial settlement of the estate of their deceased father, for the reason that as executor and partitioner of said estate he was unable to represent them, as was also their mother, Elena Graham, a resident of the city of New York, on account of the interest which she had in the estate as legatee of an aliquot part thereof. And considering the provisions of section 1854 of the Code of Civil Procedure then in force, Andrés Crosas also stated to the court that said minors had no near relative to represent them properly. The court appointed Benigno Trueba as curator *ad litem* of said minors and upon his accepting the trust and binding himself to discharge his duties well and faithfully, he was qualified as such on May 2 following.

18. On June 3, 1887, Andrés Crosas as testamentary executor of his brother, Eduardo, and Miguel Sainz and Benigno Trueba, the former as attorney in fact of Elena Graham and the latter as curator *ad litem* of the minors, Andrés and Eduarda Crosas y Graham, assisted by José S. Quiñonez, attorney-at-law, presented to the *Juzgado de Primera Instancia* of the Cathedral District drafts of the inventory, appraisement and partition of the property of the deceased Eduardo E. Crosas praying that upon being found correct they be approved and ordered filed in any of the notarial offices of San Juan, and further praying the court to take notice of the statement that María O'Ferral signed together with the petitioners in acknowledgment of her consent to and approval of her relinquishment as stated in the partition accounting of the legacies of one-fifth and one-sixth of his estate left to her by her deceased son, Eduardo, said relinquishment being in favor of his widow and two children.

The assets of Eduardo Crosas as shown in the inventory

and appraisement made by Crosas on May 25, 1887, with the
assistance of the expert appraisers, Andrés García y Quiara
and José María Fernández, are as follows:

### CASH.

1. Twenty-eight thousand two hundred fifty-six *pesos*
and ninety-five *centavos* as the share of the deceased
Eduardo of his one-third interest in Margari & Co., as
per account rendered_____ $28, 256. 95

2. Fourteen thousand one hundred twenty-eight *pesos*
and forty-eight *centavos* representing one-half of the
above-mentioned sum which he assigned and delivered to
the executor in lieu of five outstanding notes given by
Skerret Bros. & Co. in payment of their debt under the
terms of the agreement made by the interested parties__   14, 128. 48

3. Two thousand dollars paid by María O'Ferral de
Crosas with the statement that said sum belonged to the
deceased _____    2, 000. 00
                                                       _____
                                                        $44, 385. 43

### PAPERS.

4. A note signed by Manuel Barasoaín and his wife,
Juana Colón, for two thousand five hundred *pesos* in
favor of the deceased, dated September 5, 1876, due and
uncollectible from date _____    2, 500. 00

### REAL PROPERTY.

5. A vacant lot in *barrio* Puerta de Tierra in San
Juan, described and valued at two hundred and fifty
*pesos* _____      250. 00

6. One hundred *cuerdas* of the plantation Julita sit-
uated in Dorado also described and valued by experts
at six thousand five hundred *pesos*_____    6, 500. 00
                                                       _____
        Total of the inventory_____    $53, 635. 43

For the purpose of making the liquidation, accounting
and partition of the estate left by Eduardo Crosas, the ex-
ecutor, Andrés, among other explanations of the case, made
the following:

(*a*) That at his death Eduardo left the following prop-

erty: A lot in Puerta de Tierra containing two shacks in bad condition; a note of Skerret Bros. & Co. for $30,186.82; his liquidated interest in Margari & Co. which on November 30, 1877, amounted to $25,916; a note for 2,500 *pesos* signed by Manuel Barasoaín and his wife, Juana Colón, all current money.

(*b*) That in connection with the management of the said estate, he calls attention to the fact that the lot in Puerta de Tierra yields no income and does not contain the two shacks because the Government would not permit that the shacks be repaired or that the lot be devoted to any use, thus obstructing its sale; that on account of the bankruptcy of Skerret Bros. & Co. it was found impossible to collect this firm's debt at its maturity, in view of which fact, after much trouble and many negotiations and since nothing better could be accomplished, it was found necessary to receive in payment thereof 100 *cuerdas* of the plantation Julita and five promissory notes, two for $3,500 each and the others for $3,000 each, due December 22 of the years 1887, 1888, 1889, 1890 and 1891, aggregating $16,000; that the liquidated value of his one-third interest in Margari & Co., after the uncollectible accounts and their respective interests had been charged up to it, as appears in detail in the books of the said firm, amounts to $28,256.95; that the note of $2,500 signed by Manuel Barasoaín and his wife is still uncollectible on account of the insolvency of the debtors who have paid only $226.25 as interest, which amount has been credited to the proper account.

(*c*) That after the death of Eduardo Crosas all the expenses incurred on account of his illness, burial, debts and support of his widow, Elena Graham, and the two children in New York, were paid as shown in the respective accounts.

(*d*) That it being seen by the executor that the cash income from the property left was insufficient for the support of the widow and children of the deceased and the education of the latter in the State of New York he brought the

matter to the attention of the interested parties or their representatives and proposed that in order that the said object might be attained he would grant another half of the one-third interest in Margari & Co., representing $14,128.48 in cash, in exchange for the five outstanding notes of Skerret Bros. & Co., amounting to $16,000, which proposition was gladly accepted by them not only because it was considered beneficial to the parties interested and the welfare and education of the children, but because if for the same purpose the said notes should be discounted they would yield much less than the amount offered.

(e) That upon María L. O'Ferral being informed of the legacy of one-fifth and one-sixth of the estate left to her in the will by her son Eduardo and that this will was about to be probated, she informed the executor that in proof of her affection and love she would renounce the said legacies in favor of her two grandchildren and their mother, one-half of which should go to Elena and the other half to the two grandchildren, with the understanding that Elena should receive her portion in usufruct so that at her death the remainder would pass to her said grandchildren.

According to the foregoing facts and explanations and the results obtained from the accounts and corresponding papers, the executor proceeded to make a partition of the properties in the manner following:

### ASSETS.

| | |
|---|---|
| A lot in Puerta de Tierra valued at | $250.00 |
| 100 *cuerdas* of land of the plantation Julita valued at | 6,500.00 |
| Cash realized from one-third interest in Margari & Co., as per account rendered | 28,256.95 |
| Cash received from the executor representing one-half of $28,256.95, as per paragraph (d) | 14,128.48 |
| Cash received from María L. O'Ferral which she said was part of the inheritance | 2,000.00 |
| Note of Manuel Barasoaín and wife | 2,500.00 |
| Total amount of inheritance | $53,635.43 |

DEBITS.

Payments made on account of testamentary
    proceedings, as per private account
    rendered _____ $4, 307. 83
Support and education of the minor heirs___ 15, 081. 42
                                       ———— 19, 389. 25

     Net total_____ $34, 246. 18

These payments were made in cash, the former to Andrés
    Crosas and the latter to Crosas & Finlay.

DEDUCTIONS.

The legacy of one-fifth of the widow, Elena
    Graham _____ $6, 849. 24
The legacy of one-fifth of María L. O'Ferral_ 5, 479. 38
The legacy of one-sixth of the same_____ 3, 652. 92
                                       ———— 15, 981. 54
                                          $18, 264. 64

From the above net balance of $18,264.64 each of the heirs
is entitled to one-half, or $9,132.32. Owing to the renuncia-
tion by María L. O'Ferral of the legacies left to her the
following schedules were made:

SHARE OF THE WIDOW, ELENA GRAHAM.

The legacy of one-fifth_____ $6, 849. 24
One-half of the legacies renounced by María O'Ferral__ 4, 566. 15
                                         $11, 415. 39

SHARE OF ANDRÉS BERNARDINO CROSAS.

One-half of the net inheritance_____ 9, 132. 32
One-fourth of the legacies renounced by María O'Ferral_ 2, 283. 07
                                     -     $11, 415. 39

SHARE OF EDUARDA CROSAS.

One-half of the net inheritance_____ 9, 132. 32
One-fourth of the legacies renounced by María O'Ferral_ 2, 283. 07
                                         $11, 415. 39

The widow, Elena Graham, and each of her children were

awarded an equal undivided share in the Puerta de Tierra lot, in the 100 *cuerdas* of the plantation Julita, in the cash on hand, and in the note of Barasoaín and wife.

19. The inventory, appraisement, and partition of the estate left by Eduardo E. Crosas were approved by the *Juzgado de Primera Instancia* of the Cathedral District by a decree entered June 7, 1887, the dispositive part whereof is as follows:

"In my presence His Honor stated: That he should approve, and did approve, the partition, inventory, and appraisement made by the executor and partitioner, Andrés Crosas, in union with the other parties interested, Miguel Saenz and Benigno Trueba, the former as attorney in fact of Elena Graham and the latter as guardian *ad litem* of the minors, Andrés Bernardino and Eduarda Crosas, widow and children respectively of the late Eduardo E. Crosas O'Ferral, of the estate left by said Eduardo E. Crosas, and therefore order the filing thereof, together with a certified copy of this decree, in the registry of Notary Mauricio Guerra after payment for the stamped paper necessary for the purpose. Delivery should be made to each of the interested parties of his share, as allotted therein, with the titles of ownership, wherein the clerk should make a note of the award and which should be presented in the real estate transfer tax office within the period provided by law and in the registry of property for admission to record, without which formalities they will not be admitted by the courts or government offices against third parties. It was thus ordered, decreed and signed by Manuel Suárez Valdés, judge of the Court of *Primera Instancia* for the Cathedral District, before the clerk who certifies thereto. The statement referred to in the last prayer of the petition is taken notice of. Ordered and signed by the said judge before me, to which I certify. Manuel Suárez Valdés. José Ma. San Juan."

20. In a notarial instrument executed on July 25, 1887, Andrés Crosas made the following statement:

"That in consequence of a mortgage credit held by his brother, Eduardo Crosas O'Ferral, on the plantation Julita, situated in the Dorado district, which credit had been assigned to the relator in order to facilitate its negotiation, finding it difficult to realize on

said credit he entered into negotiations with Isabel Sampayo, the grantee of the properties set apart for the payment of the debts of the estate of Nicolás Ordaz, and purchased from her a portion of said plantation (100 *cuerdas* as described), and that said sale was made for the purpose of effecting a compromise, on which account it should have been made in favor of his said brother; and, inasmuch as it is necessary that the said property should be included in the estate left by his said brother, who had been the real owner of it since the year 1883, when the relator purchased it, because the credit which gave rise to said purchase was the exclusive property of Eduardo, the relator is under obligation to set forth these facts and for that reason declares: That the land described is understood to be the property of his brother, the said Eduardo Crosas O'Ferral, from the date of its purchase and he desires it to be included in the estate left by said brother at his death and, therefore, that it be first recorded in the registry in the name of his said brother in order that there may be no obstacle to the record to be made in the names of the heirs when the partition of the estate is presented in the registry of property for admission to record; and the relator renounces in their favor any right which may have accrued to him by reason of the said purchase of the property described and in compliance with his duty he repeats that he has not had nor has any share therein.''

21. Finally, by public instrument executed December 10, 1890, Andrés Crosas and Jorge I. Finlay dissolved the partnership of Crosas & Finlay, Finlay receiving from Crosas $30,000 as capital and profits and Crosas acquiring all the real and personal properties of Crosas & Finlay, among which were the lots numbered 6, 11 and 12 in the Marina, but not including the plantation "Santa Barbara."

We have taken from the facts disclosed by the evidence introduced during the trial those which in our opinion may throw light upon the case in the discussion of the grounds of the appeal, but in the course of the discussion we may make such use of the other evidence offered by both sides as we may deem necessary.

Having made the foregoing statements, we will now pro-

ceed to consider the legal questions raised in the appeal submitted for our decision.

## FIRST GROUND OF APPEAL.

In arguing the first ground of the appeal, which consists in that the *judgment is contrary to the best evidence, the prima facie evidence and the conclusive evidence, consisting of public documents, private documents recognized or accepted by the party prejudiced thereby, and to the confession of one of the parties litigant,* the appellant in his brief limited himself to transcribing section 195 of the Code of Civil Procedure, sections 1186, 1193 and 1200 of the Civil Code, and sections 70, 71 and 101 of the Law of Evidence. After stating that as proof of the errors committed in the judgment it was necessary to examine solely and simply the evidence contained in the public documents and acknowledged private documents which were introduced during the trial, of which he included an abstract, and the testimony of Andrés Crosas, he concluded with the statement that in arguing the other errors in the judgment appealed from it will be shown that all of said evidence was disregarded by the court below.

As may be seen, a fixed, positive and specific legal question is not presented in the statement of the first ground of the appeal, but said question is reserved until the time comes to specify the other errors in the judgment appealed from; therefore we have no basis upon which to discuss separately the first ground of the appeal and this will be done when an opportunity is offered in passing upon the other grounds of the appeal. We will follow the plan adopted by the attorney for the appellants.

## SECOND GROUND OF APPEAL.

As we have already stated, this ground is based upon the alleged fact that the court below committed error in *admitting the validity of public instruments relating to unper-*

*formed contracts and by refusing to order the cancellation of the record of said instruments and of others growing out of them in the registry of property.*

The public instruments referred to by the appellants are the deed executed on December 15, 1877, by which Rafael Margari sold to Andrés Crosas his share in the firm of Margari & Co., in liquidation, the instrument executed on April 28, 1880, and the two executed on the 29th of the same month of April by which Rafael Margari sold to Crosas & Finlay, represented by their managing partner, Andrés Crosas, three lots numbered 6, 11 and 12 situated in *barrio* Marina of this city.

The contents of these instruments have been recited in paragraphs 5 and 9 appearing elsewhere in this opinion.

In opposition to the deed of December 15, 1877, the plaintiffs allege in their complaint that Andrés Crosas simulated the purchase from Rafael Margari of the latter's interest in Margari & Co., in liquidation, composed of the three partners, effecting the same in his own individual name although the purchase was made with funds belonging in equal portions to the estate of his brother and to the imaginary purchaser, when, as a matter of fact, the interest already belonged to Eduardo E. Crosas and his brother, Andrés, by purchase previously made from Margari.

The inferences drawn from the testimony of Andrés Crosas given under oath is the only proof offered in support of that simulated sale, from which testimony we quote the following:

"The Crosas brothers had no intention of continuing the business in partnership with Rafael Margari but alone, and he was told by his brother that in view of the fact that he had a power to testate for him he should carry out his verbal instructions. His brother Eduardo advised him to make every sacrifice possible in order to purchase Rafael Margari's share and separate from him. When Eduardo was taken sick they thought of separating from Rafael Margari after liquidating the partnership by purchasing his

share in the name of both, and in this manner the witness effected the separation. The Crosas brothers agreed with Margari to purchase his share in the firm of Margari & Co. in the simple way such things are done in business and without legal technicalities. When a partner is going to retire from a firm two or three business men are called as witnesses and in their presence a sealed proposal is made by each bidder for the share, and following that practice the sealed bid made by the witness was found to be the best offer. The agreement to purchase from Margari his share in the firm of Margari & Co. was not made in the lifetime of Eduardo Crosas because the transaction had to take place in the presence of witnesses. After the death of his brother the witness purchased Rafael Margari's interest on his own account and on behalf of the representatives and successors of his brother. This is not the way it was set forth in the deed, it stating that the purchase was made for account of the witnesses only, because, as he had already said, such things are simplified very much among merchants, this being the reason why they are so afraid of doing business with the interests of minors.''

That testimony of Andrés Crosas appears too vague and imperfect to permit the conclusion that the purchase of Rafael Margari's share in the firm of Margari & Co. was actually made for Andrés Crosas and the heirs of his brother, Eduardo. There is no doubt that the brothers, Andrés and Eduardo Crosas, had the intention of purchasing Rafael Margari's share in Margari & Co. at the expiration of the partnership contract, but we do not know whether the Crosas brothers really did agree to make the purchase while Eduardo was still alive, for on this point Andrés Crosas contradicts himself by stating, first, that the agreement was made during the lifetime of his brother and, later, that the agreement to buy Margari's share in Margari & Co. was not made during the lifetime of his brother. Andrés Crosas also failed to inform us as to the basis upon which he and his brother, Eduardo, agreed to purchase Rafael Margari's share, nor did Margari testify at the trial of the case. Crosas said that he made the purchase for both, thus effecting the separation; but this does not confirm said assertion un-

less Crosas meant to say that the net balance of Margari & Co. was divided actually between Andrés Crosas and the heirs of Eduardo.

Even supposing that during the lifetime of Eduardo Crosas he and his brother, Andrés, made the agreement with Rafael Margari to purchase his share in the firm of Margari & Co. without fixing the terms of the contract, after Eduardo's death Andrés Crosas could not have arranged such terms on behalf of the heirs of Eduardo at the time the contract was closed, because at that time he was not the legal representative of the heirs nor the attorney in fact of Elena Graham, nor had he been confirmed as tutor of the minors, Andrés Bernardino and Eduarda Crosas y Graham.

It has not been proven, as alleged by the plaintiffs, that Andrés Crosas purchased Rafael Margari's share in Margari & Co. with funds belonging in half to the estate of his brother, Eduardo, by taking the $20,744 in cash which Crosas paid to Margari from the funds of Margari & Co., for according to the inventory of that firm made on November 30, 1877, the cash on hand at that time was only $14,419, besides, in the accounts rendered by Andrés Crosas and by Crosas & Finlay to the heirs of Eduardo Crosas no charge appears for money paid to Rafael Margari.

It is true that in the sale in question reference is made to lot No. 16, valued at $258, which amount was deducted from the $21,000 on demand of the purchaser. But in law that transaction is simply the award to a partner having an interest in the liquidation of a portion thereof for the amount at which it was assessed in the final inventory of the firm.

Perhaps the intention of Andrés Crosas was to make the succession of his brother appear as purchaser, but, as a matter of fact, the purchase was not made by the succession in accordance with the requisites essential for the validity of all contracts as provided for in article 1261 of the former Civil Code of which section 1228 of the Revised Civil Code is a reproduction.

The contract of bargain and sale was made between Andrés Crosas and Rafael Margari with all the requisites specified in said statutes, for there was the consent of the contracting parties, a definite object of the contract which was Margari's share in Margari & Co., in liquidation, a valuable consideration consisting of the payment of the price agreed upon, and the delivery of the share. Good proof of this is the deed executed on December 15, 1877, to which we must give credit owing to the fact that the alleged simulation was not proven, the burden of which proof was upon the plaintiffs according to section 108 of an Act to regulate the introduction of evidence in civil proceedings, approved March 9, 1905.

In regard to the deed executed on April 28, 1880, and the two deeds executed on the 29th of the same month for the sale by Margari to Crosas & Finlay of the three lots Nos. 6, 11 and 12 situated in the Marina of this city, the plaintiffs allege in their complaint that the purchase of said lots from Rafael Margari for the firm of Crosas & Finlay, of which Crosas was the managing partner, was simulated by Andrés Crosas and that he had said lots recorded in the registry of property in the firm's name when the so-called vendor and vendee knew that said lots belonged exclusively to Margari & Co., in liquidation, to which partnership the lots had been contributed by the vendor, the vendee having been a member of said partnership ever since its formation.

To that allegation the defendants answered that on April 28, 1880, Andrés Crosas, liquidator of Margari & Co., agreed to sell lots Nos. 6, 11 and 12 belonging to the liquidated firm of Margari & Co. to Crosas & Finlay, but that in view of the fact that the titles to these lots appeared in the deeds in the name of Rafael Margari although in fact they were the property of Margari & Co. it was necessary in order to give legal form to the transaction that their conveyance to Crosas & Finlay be made by Rafael Margari himself, which he did by the public deed already referred to.

In the course of the testimony given under oath by Andrés Crosas during the progress of the trial he amplified the foregoing allegation, explaining that the firm of Crosas & Finlay of which Andrés Crosas and Jorge Finlay were the only partners, Crosas being also the only liquidator of Margari & Co. although he was assisted by Crosas & Finlay, purchased the property of Margari & Co. including lots Nos. 6, 11 and 12, by which transaction said lots became the property of Crosas & Finlay who paid the purchase price of the lots, this sum being credited to the account of Margari & Co.

The allegations of Andrés Crosas appear to be proven by an examination of the account of Margari & Co. contained in the record and in the books of Crosas & Finlay, which books show that the purchase price of the three lots was included in the assets in the liquidation of that firm to be divided later among the members of Margari & Co., as was done. These lots appear in the general inventory of Crosas & Finlay of 1878 as a part of the assets of that firm and in 1890 they passed to Andrés Crosas as the result of the dissolution of Crosas & Finlay in which Andrés Crosas acquired all the real and personal property of Crosas & Finlay, including said lots but excepting the plantation "Santa Barbara," according to the deed executed on December 10 of said year. It is true that Rafael Margari did not sell the lots in question to Crosas & Finlay for he could not really do so because they were not his exclusive property. But as it is a positive fact that the lots belonged to Margari & Co. although they appeared in the name of Rafael Margari and that Margari & Co., in liquidation, sold said lots to Crosas & Finlay, we see no difficulty in Rafael Margari's transferring the titles directly to Crosas & Finlay in order to save time and expense, as he did, instead of transferring said titles to Margari & Co. so that the firm might convey them to Crosas & Finlay without prejudice to the succession of Eduardo Crosas. Crosas & Finlay being the owners of the lots, either the transfer of the titles by Rafael Margari to Crosas & Finlay

directly or to Margari & Co. so that the latter firm might transfer them to Crosas & Finlay would have resulted in the same thing as far as the succession was concerned.

### THIRD GROUND OF APPEAL.

It is alleged as said ground that the court erred in decreeing the validity of the appointment of a testamentary guardian made by an attorney in fact who had not been given power for that purpose, the appointment being that of the guardian and curator *ad bona* of Eduarda Crosas y Graham without security and with the use of her income for her support, attorney in fact Andrés Crosas so appointing himself. It is alleged that in this act Law 31 of Toro, which is Law 1, Title XIX, Book X, of the *Novísima Recopilación,* was violated. Said law reads as follows:

"Whereas it often happens that some persons either because of inability or lack of desire to make their wills give others power to perform this for them, and these agents commit many frauds and deceptions in connection with such powers, overstepping the limits of the intention of their principals; therefore, in order to prevent such wrongs we hereby order and decree that from this time on agents under such powers shall not designate any person as heir of the testator's estate nor establish betterments of the third or the fifth thereof, nor disinherit any of the children or descendants of the testator, nor substitute them simply, pupilarily or in trust or in any manner whatever, nor appoint a guardian for any of the children or descendants of the testator except when in the power of attorney authorizing him to make the will *express provision is made empowering him to perform any of said acts.* The party giving the power of attorney must mention by name the person whom the agent shall designate as heir; and as to the other acts, *he shall specify those for the performance of which he gives the power,* and in that case the agent can do what he has been given express power to do and no more."

In paragraph 3 we have inserted the clauses pertinent to the power to make the will which Eduardo Crosas executed in favor of his brother Andrés on November 4, 1877.

In clause 3 of that power, as we have already stated, Eduardo Crosas appointed Andrés Crosas as guardian and curator *ad bona* of his son, Andrés Bernardino Crosas, who was then about six months old, without security and allowing him to use the income of the minor for the latter's support. Neither in this nor in any other clauses of the power of attorney is Andrés Crosas authorized to appoint himself as guardian of Andrés Bernardino Crosas, the fact being that the principal himself appointed him as such and it was so understood by Andrés Crosas when executing his brother's will on January 14, 1881, in the exercise of the power with which he had been vested, for in the third clause of that will Andrés Crosas expressly states that his principal appointed him as guardian and curator *ad bona* of the former's legitimate son, Andrés Bernardino Crosas y Graham. Notwithstanding the lack of said authority, in compliance with the express intention of his brother Eduardo, as he says, and following the definite instructions which he received from his brother, Andrés Crosas extended the appointment made in his favor by Eduardo as guardian and curator *ad bona* of Andrés Bernardino Crosas to include his other child, Eduarda, also without giving security and with a right to use her income for her support.

According to the law quoted, Andrés Crosas could not have made the appointment of the guardian and curator *ad bona* of Eduarda Crosas unless he had been given express power to do so, which power, as we have already said, was not conferred upon him.

The fact that Andrés Crosas in making the appointment of guardian and curator *ad bona* of Eduarda Crosas did so in compliance with the express wish of his brother Eduardo and in accordance with the definite instructions which he had received from him is not sufficient to make said appointment legal, for the power of attorney does not show such intention and the instructions, if given, should have been recited

expressly in said power in order to have legal value and comply with the law quoted.

The judgment of the Supreme Court of Spain of September 19, 1853, invoked by appellants in their favor supports rather than contradicts our opinion.

Therefore the appointment of the guardian and curator *ad bona* of Eduarda Crosas was illegal as in violation of Law 31 of Toro. But inasmuch as Andrés Crosas, as guardian of the minor Eduarda, did not intervene in the partition of the property of Eduardo, the illegality of said appointment did not affect said partition which, therefore, will remain effective in law unless rendered void by other reasons, in view of which the nullification of the appointment of guardian and curator in question would serve no practical purpose.

#### FOURTH GROUND OF APPEAL.

The confirmation of Andrés Crosas as guardian of Andrés Bernardino and Eduarda Crosas y Graham without giving security and with the privilege of using their incomes for their support, which confirmation is objected to as illegal, is the fourth ground of the appeal, in support of which citation is made of articles 1261, 1269 and 1270 of the Spanish Code of Civil Procedure of 1865 which took effect in this Island on June 1, 1866.

The articles cited read as follows:

"Article 1261.—Before confirming the appointment of any guardian, either as curator *ad bona* or conservator (*curador ejemplar*), the court shall decide whether or not he is to discharge his duties with the privilege of disposing of the income for their support, taking into consideration the value of the property of the minor or incapacitated person as well as their personal circumstances and hearing the *fiscal*.

"In case it is not decreed that this privilege shall be allowed, the judge shall designate what the minor should need for his support and education and the percentage to be allowed for the administration.

※          ※          ※          ※          ※          ※          ═

"Article 1269. The provisions of the foregoing articles having been complied with, the appointee shall be required to furnish good security for the faithful discharge of his duties under the responsibilities which the law imposes.

"Article 1270. When the security is furnished an order to confirm the appointee shall be issued at once wherein the judge shall vest the appointee with power to represent the minor, in accordance with the provisions of law, and to look after his person and property."

Appellants assert that none of the requirements of the law had been complied with prior to the confirmation of Andrés Crosas by the *Juzgado de Primera Instancia* of the Cathedral District of San Juan on May 28, 1881, as guardian of the Crosas minors inasmuch as nothing was done to ascertain the value of the property of the minors nor their personal circumstances, the *fiscal* was not heard, the judge did not decide whether or not the guardianship was to be discharged with the right to use the income of the minors for their support and education, nor was the guardian required to furnish security for the faithful performance of his duties.

It is true that the provisions of article 1261 were not complied with, but that was not necessary in a case of this nature where the guardian was not required to furnish security because he had been relieved of this requirement and granted the privilege of discharging his duties with the disposition of the income of the minors for their support and education.

It does not appear in the proceedings that Andrés Crosas gave security for the faithful performance of his duties under the responsibilities imposed by law, but the absence of that requisite, which is neither substantial nor essential, does not render his confirmation void; for in applying for the same it is evident that Andrés Crosas agreed to accept the trust with all the consequences attached thereto and consequently assumed the obligation of discharging his duties well and faithfully, which obligation might have been required of him anyhow according to law. The fact that Crosas did not

furnish security did not relieve him of the duty of discharging his guardianship duties well and faithfully.

At any rate we will repeat what we have already stated in passing upon the preceding ground for the appeal—that is, that Andrés Crosas did not take any part in the partition of the estate of Eduardo Crosas as guardian of the latter's minor children—and therefore the legal formalities which were not complied with upon his being confirmed as guardian, whatever they may be, could not affect said partition in which Benigno Trueba intervened as curator *ad litem* of the minors Crosas y Graham.

### FIFTH GROUND OF APPEAL.

In setting up this ground of appeal objection is raised to the delegation of Benigno Trueba as curator *ad litem* of the minors, Andrés Bernardino Crosas and Eduarda Crosas y Graham, on the ground that the legal provisions pertinent to the case were violated in the appointment and confirmation of said curator *ad litem.*

In support of their contentions the appellants cite articles 1851, 1852, 1854 and 1859 of the Code of Civil Procedure which took effect in this Island on January 1, 1886, by virtue of a Royal Decree of September 25, 1885.

These articles read as follows:

"Article 1851.—Minors under twenty-five years of age who are subject to *patria potestas* shall be represented in court by the persons having them under their charge.

"Those who are not subject to *patria potestas* shall be represented by their guardians or curators.

"Article 1852.—When the parents of the minors under *patria potestas* or their guardians or curators are unable to represent them in court according to law a curator *ad litem* shall be appointed.

"The same shall be done when the minor or incapacitated person has no guardian or curator.

\*    \*    \*    \*    \*    \*    \*

"Article 1854.—The appointment of a curator *ad litem* shall be

given to an immediate relative of the minor if there be cne and if not, to an intimate friend of the minor or of its parents; and when there is no such person or when such person has not the necessary legal qualifications, then the judge shall appoint a person in whom he has confidence.

    *        *        *        *        *        *        *

"Article 1859.—The representation of the curator *ad litem* shall cease when a guardian or curator *ad bona* or a conservator (*curador ejemplar*) shall have been appointed for the minor or incapacitated person or when the incapacity shall have disappeared."

We do not find that the legal provisions above quoted have been violated in this case.

Andrés Crosas as guardian of the minors, Andrés Bernardino and Eduarda Crosas y Graham, was the proper person to represent them according to the provisions of article 1851 above cited; but inasmuch as Andrés Crosas could not represent the minors in connection with the partition of the estate of his brother, Eduardo Crosas, because his interests and those of the minors conflicted, as a mere perusal of the partition proceedings will show, it was found necessary to follow the provisions of article 1852 and appoint a curator *ad litem.*

Andrés Crosas was the *de facto* guardian of the minors, Andrés Bernardino and Eduarda Crosas, and after being confirmed as such it was his duty to continue performing the duties thereof until he had ceased to be such guardian for any of the reasons which extinguish the guardianship, or had been removed by competent judicial authority.

The objection to the confirmation of Benigno Trueba as curator *ad litem* of the minors, Andrés Bernardino and Eduarda Crosas, after he had discharged his duties as such by intervening in the partition of the estate of Eduardo Crosas and after he had ceased to be such curator and said partition had been approved, is both untimely and too late. The objection was made also in a manner contrary to law for it was made without having heard the interested party and in

violation of article 1878 of the code invoked by the appellants, which article provides that guardians and curators, whether *ad bona* or *ad litem,* cannot be removed in *ex parte* proceedings even though it be at the request of the minors, and that for the purpose of ordering their removal after their confirmation as such they must be heard in open court.

If Benigno Trueba was not the proper person to discharge the duties of curator *ad litem* of said minors his appointment should have been objected to before it was confirmed, or after being confirmed his removal should have been requested and a chance given him to be heard before the court, but this was not done; on the contrary, not only Elena Graham represented by her attorney in fact, Miguel Sainz, but the grandmother of the minors Andrés Bernardino and Eduarda, far from objecting to said guardianship accepted the same when they appeared before the *Juzgado de Catedral* with Andrés Crosas and Benigno Trueba for the purpose of securing the approval of the partition of the estate of Eduardo Crosas.

Furthermore, Benigno Trueba ceased to be curator *ad litem* upon the approval of the partition of the estate and, therefore, the petition now made to rescind his appointment as such serves no purpose, for if he did not discharge his duties well and faithfully the law provided then, as it does now, a remedy whereby Trueba could have been held accountable.

### SIXTH GROUND OF APPEAL.

This ground of the appeal is founded on the alleged fact that the partition of the inheritance was not lawfully approved by the interested parties because neither had Miguel Sainz sufficient power from Elena Graham for that purpose nor could Benigno Trueba be called curator *ad litem* of Andrés Bernardino and Eduarda Crosas y Graham because his appointment and confirmation were not made according to law; and, furthermore, because the said partition of inheri-

tance rested upon false premises because it was not true that the debt of Skerret Bros. & Co. to Eduardo Crosas could not possibly be collected; that it was also untrue that it was necessary to receive in payment thereof 100 *cuerdas* of land of the plantation "Julita" and five notes, two for $3,500 each and the other three for $3,000 each, due December 22, 1887, 1888, 1889, 1890 and 1891; that it was likewise untrue that the share of the heirs of Eduardo Crosas in the liquidation of Margari & Co. was only one-third thereof; and that the agreement made by the executor with the representative of the parties interested in the inheritance for the exchange of one-half of the share in the liquidation of Margari & Co. for the aforesaid notes was also untrue and void because one-half of the one-third interest in Margari & Co. belonged to the heirs of Eduardo Crosas by virtue of the sale made by Margari of his one-third interest to Andrés Crosas for account of Andrés and his brother Eduardo, and the five notes were also the property of said heirs, because they were part of the proceeds of the sale of the plantation "Cocos," which was purchased by Andrés for the succession and afterwards sold by him to Carlos and Emilio Just y Jensen.

In connection with the sixth ground of the appeal we invite attention to the fact that among the principal allegations of the complaint the following is made:

"*First.* It being impossible for the plaintiffs to fix the exact amount and value of the property left by Eduardo Crosas because all the papers relating thereto are in the possession of the defendant, Andrés, they assert without contradicting the facts appearing from the books and private documents of said Eduardo Crosas and of the firm of Margari & Co., of which he was a member, that the value of said property is greater than that shown in the figures given below:

| | |
|---|---:|
| Cash | $27,525.00 |
| Furniture and personal property | 2,000.00 |
| Credits | 34,686.82 |
| Immovable property | 2,250.00 |
| Carried forward | |

Brought forward_____

One-half interest in the capital and profits of Margari & Co_____     38, 875. 91

Total_____ $105, 337. 73

"*Second.* That Andrés Crosas having taken possession of all the property and documents of his brother Eduardo he appropriated to himself a large part of the inheritance estate by various means, among them the following:

"(*a*) *   *   *.

"(*b*) By purchasing on his own account and with funds of the estate a plantation in the district of Río Grande known as 'Cocos,' for $15,000, which property he sold afterwards, also in his own name, to Carlos and Emilio Just for $25,000.

"(*c*) By accepting $30,186.82, Mexican silver, in payment of a mortgage credit (which the estate held against Skerret Bros. & Co.) for the same amount but payable in American gold with interest at 12 per cent per annum.

"(*d*) *   *   *.

"(*e*) By loaning in his own name $12,525 out of the estate to Nicolás Ordaz or his wife, Isabel Sampayo, receiving in payment thereof in his own name 100 *cuerdas* of the plantation Julita, situated in the district of Dorado.

"(*f*) By recording in his own exclusive name the possessory title to two-thirds of the houses No. 40 Luna Street and No. 8 San José Street in this city notwithstanding the fact that one-third thereof belonged to the said estate.

"(*g*) By making a partition of the estate of Eduardo Crosas, excluding from a list of the properties thereof the $30,186.82 representing the proceeds of the mortgage credit against Skerret Bros. & Co. and the $25,000, the proceeds of the sale of the plantation 'Cocos,' and also by making the false statement that the note of Manuel Barazoaín and wife was uncollectible from date.

"(*h*) By acknowledging in the said partition a credit of $4,307.83 in favor of the executor and another of $15,081.42 in favor of Crosas & Finlay, which amounts were not owing to them and which were paid in cash."

In regard to the allegation made that Miguel Sainz did not have sufficient power from Elena Graham to represent her in the partition of the property left by Eduardo Crosas,

we will examine the power of attorney held by Sainz and executed in the city, county and State of New York on December 13, 1886, in which document Elena Graham expresses herself as follows:

"By these presents she gives and grants unto Miguel Sainz, who is of full age and a resident of the city of San Juan, Island of Porto Rico, full power and authority to do and perform all and every act and everything whatsoever requisite and necessary to be done to take in her name all legal steps necessary for the settlement of the estate of her deceased husband, the said Eduardo E. Crosas, requiring the testamentary executor of her husband, Andrés Crosas, to execute the will and testament of the former in accordance with the instructions given him in the power of attorney executed November 4, 1877, in the city of San Juan, Porto Rico, before Notary Public Demetrio Jiménez y Moreno, giving a list of the properties of which the estate consists and specifying such of them as form part of her one-half interest as well as those which belong to Andrés Bernardino and Eduarda Crosas, his children born during the marriage; to exact and take part in the making of an inventory, appraisement, and the presentation of the verified accounts of the adjudication and partition of the estate between her and her said children in accordance with the instructions left by the testator; to exact an accounting of the executorship and such other accountings as may be deemed necessary; to examine such accounting, approving or rejecting their items in his best judgment; to intervene in the appointment of appraisers, custodians and experts appointed to appraise the properties of which the estate consists, and, generally, to perform all and every act inherent to his power until the final termination of the testamentary proceedings; to accept, collect and take possession, under benefit of inventory, of the property left, assigned, or adjudicated to her, giving receipts, acquittances, and executing such deeds or other documents as may be required; to cause the real properties to be recorded in the registries of property of the districts in which they are situated, as well as all the other instruments with reference thereto, signing the lists, inventories, possessory title proceedings, additional notes, petitions and any other paper required, taking whatever steps are necessary for the purpose; to appear if necessary, assisted by counsel and procurators to be appointed by him, before the courts and competent authorities, etc."

As may be seen, Elena Graham gave this power of attorney to Miguel Sainz authorizing him to take all necessary legal steps for the settlement of the estate of her deceased husband in representation of her rights and interests, and, generally, to do and perform all acts and things inherent to his power until the final termination of the testamentary proceedings.

José María Manresa y Navarro, in his commentary on the Spanish Code of Civil Procedure, says:

"By testamentary proceedings is understood everything done in connection with the execution of a last will and testament; wherefore this name is given to a meeting of testamentary executors; to the roll of documents and other papers required to comply with the will of the testator; to the steps and transactions extrajudicially and privately performed by the testamentary executors or by the heirs themselves in connection with the inventory, appraisement, payment of debts and legacies, the liquidation and partition of the inheritance and the execution of the other instructions left by the testator; and finally, to the judicial proceedings instituted for this same purpose whether officially or at the request of a party lawfully entitled thereto."

Inasmuch as Elena Graham gave Miguel Sainz power to represent her in the testamentary proceedings of Eduardo Crosas, it is clear that he had this power from her to represent her whether the estate was to be settled judicially or extrajudicially. The fact that the testamentary proceedings were carried on through the ordinary legal channels does not signify that Sainz was under obligation to take every legal step in connection with the testamentary proceedings, but only such as he deemed necessary, especially considering that in the power to make his will, executed by Eduardo in favor of his brother Andrés on November 8, 1877, the latter was instructed to proceed extrajudicially in settling his last will and testament, expressly prohibiting the taking of any other course.

The legal steps necessary to be taken were those pro-

vided for by law, for, according as the settlement was judicial or extrajudicial, the testamentary proceedings were to be commenced only if the interests of Elena Graham required it and so far is this a fact that in the power of attorney Sainz is authorized to appear in court, if necessary.

The real intent and purpose of Elena Graham was, therefore, that the estate of her husband should be settled judicially only if it was found necessary.

But even though the power given by Elena Graham to Sainz should not be considered sufficient for the extrajudicial settlement of the partition of Eduardo's estate, Elena Graham would be without power to contest the validity of the said partition on the ground already stated, because she herself in her sworn testimony said that she was satisfied with the partition-made of her husband's estate when Sainz suggested that she give it her approval, and she also confessed having sent to her attorney in fact a memorandum expressing her views and opinion in regard to the questions connected with her husband's estate for his guidance in the exercise of his power. She cannot now repudiate her own acts.

In regard to the contention that Benigno Trueba as curator *ad litem* of the minors, Andrés Bernardino and Eduarda, had no power to approve the partition of the estate of Eduardo Crosas, we refer to what we have already stated upon examining the fifth ground of the appeal. There can be no doubt of the legality of the representation of Benigno Trueba in this matter.

Let us now enter upon an examination and consideration of the transaction which counsel for the appellants declared false and upon which Andrés Crosas based the partition of the estate the nullity of which is sought.

In reviewing the second ground of the appeal we stated that whatever may have been the purpose of Andrés Crosas and his brother in buying Rafael Margari's interest in Margari & Co., such purchase by Andrés was unquestionably

made by and for himself according to the deed dated December 15, 1877; consequently, the estate of Eduardo Crosas did not acquire through such sale any right whatever to one-half of the one-third interest which Rafael Margari had in the liquidation of Margari & Co.

Should we confine ourselves to the facts stated in this opinion in paragraphs 8 and 10 concerning the acknowledgment of a mortgage credit for $30,186.82 in a public instrument dated May 25, 1878, executed by the firm of Skerret Bros. & Co. in favor of the Succession of Eduardo Crosas, and to the sale of that credit at auction and the adjudication thereof on August 12, 1881, to Nicolás Ordaz who paid to Andrés Crosas the full value thereof in Mexican silver, and should we connect said facts with the contents of another public instrument dated August 31, 1883, herein referred to in paragraph 15 of the facts stated in this opinion, by which deed Isabel Sampayo, widow of Nicolás Ordaz, granted to Andrés Crosas a tract of 100 *cuerdas* of land of the plantation "Julita" in payment of a debt of $12,523, we would easily reach the conclusion that the statement to the effect that the collection of the debt of Skerret Bros. & Co. of $30,186.82 could not possibly be made is false, and that the statement that it was necessary to receive in payment of their debt 100 *cuerdas* of land of the plantation "Julita" and five promissory notes, two for $3,500 and the other three for $3,000 each, maturing on December 22, 1887, 1888, 1889, 1890 and 1891 was likewise false, because if the debt of Skerret Brothers had been extinguished by reason of its adjudication or assignment to Nicolás Ordaz for value received in Mexican silver, it could not be paid with 100 *cuerdas* of land of the plantation "Julita" and with the five promissory notes mentioned.

Such falsity would be more apparent still should we refer to the deed of July 14, 1881, marked No. 12 in the statement of facts hereinbefore mentioned, by which deed Skerret Bros. & Co. sold to Andrés Crosas the farm known as "Los

Cocos'' for $15,000, and compare that deed with the other of December 22, 1883, marked No. 13, by which Andrés Crosas sold to Carlos and Emilio Just y Jensen the said plantation ''Cocos'' for $25,000, $6,000 of that sum being paid in cash and the balance of $19,000 to be paid in six instalments, due December 22, 1886, 1887, 1888, 1889, 1890 and 1891, the first, fourth, fifth and sixth of the instalments being for $3,000 and the second and third for $3,500, the balance due being secured by a mortgage.

It seems that the last five promissory notes above mentioned, judging by the identity of their values and of the dates of their maturity, are the same promissory notes which, according to the partition of the inheritance of Eduardo Crosas, belong to that estate and which Andrés Crosas received in lieu of one-half of the interest of Rafael Margari in Margari & Co. under the agreement made with the interested parties. We are inclined to believe this because, notwithstanding the deed of sale of the property ''Cocos'' executed by Skerret Brothers to Andrés Crosas, in the execution of which the Succession of Eduardo Crosas did not take the least part, Andrés delivered to Miguel Sainz in his capacity of attorney in fact of Elena Graham, together with copies of other accounts, a copy of an accounting of the plantation ''Cocos'' for his examination, which account together with others were submitted for approval during the partition of the estate of Eduardo Crosas as if the plantation ''Cocos'' had been purchased for the estate of Eduardo Crosas.

The preceding statement is corroborated by the fact that in a letter dated December 1, 1882, addressed by Andrés Crosas to Elena Graham, he states among other things, the following:

''Tell little Andrés that as he is fond of the country I have here for him a property of more than 600 *cuerdas* with 200 head of cattle and 12 horses, on which I am planting rice, corn, cocoanuts, potatoes of all kinds, and fine tobacco. Two large rivers bound the property. When he becomes a man he may come down and work

it, for it will make a splendid sugar-cane plantation, but he must be a good boy, not lazy, and study hard.''

Andrés Crosas admitted that that letter alluded to the plantation ''Cocos'' and that his intention was to stimulate his nephew in his studies without committing himself to carry out the promise.

We need not draw the inference, however, that although the plantation ''Cocos'' appears in a public instrument as the property of Andrés Crosas it really belonged to the estate of his brother, Eduardo, and consequently that the proceeds of its sale by Andrés Crosas to Carlos and Emilio Just y Jensen also belonged to said estate, because other evidence introduced at the trial prevents us from reaching such a conclusion as well as the conclusion that the credit of $30,186.82, which in a deed dated May 25, 1878, Skerret Brothers recognized in favor of said estate, was the exclusive property of the estate of Eduardo Crosas.

In allegation 29 of the answer to the complaint the statement is made that ''the brothers, Eduardo and Andrés Crosas, were engaged in a business independent of that of the firm of Margari & Co., their capital being $30,000, one-half of which was contributed by each, said $30,000 being the amount loaned to the firm of Skerret Bros. & Co.''; and when testifying at the trial Andrés Crosas repeated under oath the statement made in the complaint, adding that the plantation ''Cocos'' and 100 *cuerdas* of the plantation ''Julita'' were given by Skerret Bros. & Co. in payment of that debt, which latter property, being more saleable, was assigned by him to Eduardo, the witness keeping the plantation ''Cocos'' in satisfaction of the one-half interest to which he was entitled.

In a letter of February 10, 1887, addressed to Elena Graham by her attorney in fact Miguel Sainz, enclosing the will executed by Andrés Crosas, the partition of the estate of Eduardo and several accounts presented to him by Andrés,

among them being the account of the plantation "Cocos," Sainz, as if surprised at the fact that in clause 4 of said will and in the inventory of the properties of Eduardo there was included a promissory note for $30,186.82' which Skerret Bros. & Co. acknowledged in favor of Andrés Crosas, said: "I thought the debt of Skerret Bros. & Co. belonged in equal shares to Eduardo and Andrés."

In her testimony Elena Graham, having the above sentence from the letter of Sainz before her, said that she "accepted as true that that credit belonged to the two brothers."

We find, therefore, that both parties agreed that the $30,000 note of Skerret Bros. & Co. belonged to Andrés and Eduardo Crosas in equal shares, and we do not think it admissible, as contended by the appellants, that that note of $30,000 against Skerret Bros. & Co. belonging to the brothers Andrés and Eduardo together was distinct from the other mortgage credit for $30,186.82 which Skerret Bros. & Co. acknowledged in favor of the estate of Eduardo Crosas in a public instrument dated May 25, 1878, and which was adjudicated to Nicolás Ordaz at the public sale held on August 12, 1881, the amount of which was paid to Andrés Crosas on September 5 following.

Andrés Crosas did not testify on the stand that these credits were distinct ones; furthermore, in a letter which he addressed to Elena Graham on October 15, 1882, he made it understood clearly that there were not two distinct credits, one a mortgage credit and the other a common credit, in favor of the estate of Eduardo Crosas, by saying to Elena among other things the following:

"We have now come to the debt of the Monserrate plantation— that is to say, that of Skerret Bros. & Co.—which has turned out to be a very bad one. In the first place, we have only simple receipts for money advanced to them, which receipts, under the Spanish law, are not binding upon the debtor. After a great deal of shuffling I succeeded in obtaining from them a public instrument much better to collect upon, but in the beginning of 1878 they went into sus-

pension of payment which continued up to 1880, when they failed completely. From that time until yesterday, or two hours before receiving your letter, I have been having some trouble with the matter every day. The legal procedure is long, slow and expensive, for which reason I did not care to throw away money in a lawsuit and obtain nothing. Finally, after many negotiations and after overcoming a lot of intrigues and obstacles, it was agreed that I should take land in payment of the debt. It is now nearly two years since we have been treating about this matter, but what with the notary, the judge, the lawyer, the minors, the registrar and the devil only knows what more, I have been having a lot of difficulties, even including a lawsuit in which I was mixed up in a private way. Now I am almost at the end of it, but in all probability I shall wind up next year about where I started. I have a good purchaser for the lands in the case of my taking them, and if he does not buy I have another just as good. This is the way matters stand, to make a long story short."

The public instrument referred to by Andrés Crosas in the foregoing letter must have been the deed of May 25, 1878, for there is no other document in the record acknowledging a credit by Skerret Bros. & Co. in favor of the estate of Eduardo Crosas; and if this is a fact and the credit acknowledged by the instrument of May 25, 1878, had not yet been collected at the date of the letter, October 15, 1882, we are unable to understand how that same credit could have been extinguished the year before, or in 1881, by reason of its adjudication to Nicolás Ordaz and its payment by Ordaz to Crosas.

That there was only one credit of Skerret Bros. & Co. is also indicated by the will made by Andrés Crosas in behalf of his brother on January 14, 1881, for in clause 4 thereof, containing an inventory of the property of the deceased, mention is made of only one obligation acknowledged in a public deed by Skerret Bros. & Co. in favor of Eduardo, for money advanced for the running expenses of the plantations "Monserrate," "Julita" and "Carmela," amounting to $30,186.82. That public instrument must be that of May

25, 1878, to which we have so often referred. There is a plain contradiction between the fact set forth in the will that the said obligation for $30,186.82 was in favor of Eduardo Crosas and the sworn statement of Andrés Crosas to the effect that the obligation of Skerret Bros. & Co. belonged to Andrés and Eduardo Crosas jointly.

It seems to us that the lands referred to in the letter to Elena Graham from Andrés Crosas dated October 15, 1882, and which Andrés agreed to take from Skerret Bros. & Co. in satisfaction of the debt which they acknowledged in the public instrument of May 25, 1878, are the lands of the plantation "Cocos" which Andrés acquired from Skerret Bros. & Co. by the public instrument of July 14, 1881, and which he afterwards sold to Carlos and Emilio Just y Jensen by another deed of December 22, 1883, and this may be conjectured from the letter of Andrés to his sister-in-law, Elena Graham, of September 1, 1882, which we have partially quoted, and from the fact that she presented to Miguel Sainz an account of the plantation "Cocos" for his examination together with the other accounts connected with the testamentary proceedings of Eduardo Crosas, all of which were filed in the court with the partition proceedings of the property of Eduardo Crosas.

However, we find it difficult to understand with no further explanations than have been given us how the obligation of $30,186.82, secured by a mortgage, could have been paid off with the lands of the plantation "Cocos" which Andrés Crosas purchased in his own name by public deed of July 14, 1881, and we find it still more difficult to accept the statement that the said debt was paid with 100 *cuerdas* of land of the plantation "Julita," which by public deed of August 31, 1883, Isabel Sampayo, widow of Nicolás Ordaz, conveyed to Andrés Crosas in payment of the debt mentioned in the will of Nicolás Ordaz amounting to $12,523 and which, according to the deed, originated in the assignment of an obligation of Skerret Bros. & Co. by Andrés Crosas to Ordaz.

And as the only obligation appearing in the record as having been assigned by Andrés to Nicolás Ordaz is that of Skerret Bros. & Co. for $30,186.82 which was assigned or conveyed to Ordaz at public auction, the question arises: Was not the obligation for $12,523 a part or the balance of that for $30,186.82? If so, how is it that according to the court proceedings the obligation for $30,186.82 appears to have been settled by its assignment to Nicolás Ordaz?

It is surprising that the judge did not sign the document transcribed in paragraph 11 of the statement of facts concerning the payment by Ordaz to Crosas of the $30,186.82 representing the proceeds of the public sale of the mortgage credit notwithstanding the statement made therein that the judge signed the same together with Ordaz and Crosas in the presence of the clerk, José María San Juan.

The obscurity enveloping these records fills the court with perplexity, vacillation, and doubt, and owing to such vacillation and doubt, which it was the duty of the plaintiffs to remove, we are unable to declare void the partition of the estate of Eduardo Crosas in the absence of satisfactory evidence in support of the alleged fraud.

We will take for granted, as it is a fact which both parties have admitted, that Andrés and Eduardo Crosas held jointly a credit against Skerret Bros. & Co. for $30,000, and as there is no doubt in our minds that the handling of that sum of money was in charge of Andrés Crosas, our conclusion is that the two brothers owned that credit and its earnings in common. This community of ownership was dissolved by the parties thereto upon the partition of the estate of Eduardo Crosas, in which partition they were properly represented, and this partition terminated also the community of rights and interests which Elena Graham and her children had with Andrés Crosas in Margari & Co.

The agreement arrived at in the partition proceedings approved by the court is law both for Andrés Crosas and for the estate of Eduardo Crosas.

In regard to the liquidation of Margari & Co., article 234 of the Code of Commerce which follows may be invoked:

"In the liquidation of commercial associations in which minors or incapacitated persons are interested, the father, mother, or guardian of the latter shall act, as may be the case, with full powers as though a private transaction were involved, and all the proceedings instituted and consented to by said representatives for their principals shall be valid and irrevocable without privilege of restitution and without prejudice to the liability the former may contract with regard to the latter by reason of their carelessness or negligence."

If the minor children of Eduardo Crosas were prejudiced by the liquidation of Margari & Co. they could have presented a claim against their curator *ad litem,* Benigno Trueba, who gave his approval to the share allotted to them in the liquidation of said firm, either prior or subsequently to their attaining their majority.

We will not conclude our review of the sixth ground of the appeal without considering the contentions made by the party plaintiff with reference to houses No. 40 Luna Street, and No. 8 San José Street, of this city, to the item of $4,307.83 acknowledged in favor of Andrés Crosas in the partition, and to the other item of $15,081.42 which was also acknowledged in favor of Crosas & Finlay in the same partition.

As a matter of fact Eduardo Crosas, his brother Andrés and his sister Ana, were the owners of the two houses above mentioned by inheritance from their father, Bernardino, and in spite of the fact that one-third thereof belonged to the estate of Eduardo Crosas, Andrés Crosas and Miguel Sainz, the surviving spouse of Ana, brought possessory title proceedings in which they stated that two-thirds of those houses belonged to Andrés and the other third to Ana, which proceedings being approved by the court served as the title under which the sale of said houses was made; but although in said possessory title proceedings the rights of Eduardo or

of his heirs were not recognized, they suffered no prejudice because one-third of the proceeds of the sale was credited to the account of the estate of Eduardo Crosas, as shown by the record, apart from the fact that the plaintiffs have raised no objection to said proceedings and the sale of the houses which followed.

The credit in favor of Andrés Crosas in the partition account for sums which the estate owed him was proven at the trial by means of the private account of Andrés Crosas and other documents introduced in support thereof; to which may be added the fact that the account was not objected to by the plaintiffs at the time the partition of the estate of Eduardo Crosas was approved. The other credit of Crosas & Finlay was also proven by the account of Crosas & Finlay with the estate of Eduardo Crosas which, as was the case with the account previously mentioned, was before the interested parties who far from objecting to it accepted it, thus admitting the correctness of said debt.

The promissory note of Barazoaín and his wife which the executor in the partition account declared uncollectible when, as a matter of fact, it was not, according to the allegation of the plaintiffs, by its own terms became due March 5, 1877, or at the time when Eduardo Crosas was still living, notwithstanding which fact it was not collected by him. If the executor was negligent in the collection thereof, thus rendering the note uncollectible, such negligence would call for an action against Crosas, but this fact would in no case nullify the partition of the estate of his brother.

None of the reasons alleged by the party appellant in support of the nullification of the partition justify their contention, and the decision rendered by the court below in the case should be affirmed.

### SEVENTH GROUND OF APPEAL.

If the partition of the estate of Eduardo Crosas cannot be considered null and void, it is obvious that the community

of interests between Eduardo and his brother Andrés in the firm of Margari & Co. and in the credit owned by them jointly was dissolved by reason of said partition, for in that partition the estate of Eduardo Crosas was assigned a cash amount for its interest in the firm and in the credit.

The court below acted within the law in refusing to order a dissolution of the community which had already become dissolved by the partition and the. lack of a direct order upon that point is not an error in substance or in procedure.

We may well disregard the plea of prescription alleged by the defendants in their answer to the complaint, not only because the action being improper a discussion of its extinguishment by prescription would be useless, but also because in answering the appeal the defendants failed to make any allegation whatever, as they might have done, looking to the affirmation of the judgment under the statute of limitation if the judgment were to be reversed on the grounds alleged by the appellants in their defense.

However, it is well to state that not only the contracts referred to in the deed of December 15, 1877, by which Rafael Margari sold to Andrés Crosas his interest in the firm of Margari & Co., in liquidation, and the other three deeds of April 28 and 29, 1880, by which Rafael Margari conveyed to Crosas & Finlay the titles to lots Nos. 6, 11 and 12 located in the Marina of this city, but also the agreement between all the interested parties—Andrés Crosas in his own behalf, Miguel Sainz in behalf of his principal, Elena Graham, and Benigno Trueba in behalf of the Crosas minors—had legal existence at the time of the approval of the partition of the estate of Eduardo Crosas on account of being attended by all the requirements of section 1228 of the Revised Civil Code (1261 of the old code), although such contracts and stipulations may be voidable under section 1267 of our code (1301 of the old code); but the action for nullity may be brought only within four years, according to both codes, a period of time which with reference to Elena Graham began

to run from the date of said contracts and with regard to the minors, from the time they became of age. Section 1268 of the Revised Civil Code (article 1301 of the old code).

Inasmuch as the complaint which originated this suit was filed on November 14, 1908, or more than four years after the minors, Andrés and Eduarda, became of age (one having been born in 1877 and the other in 1878), there can be no doubt that the action to secure the nullity of the contracts and stipulations above referred to, if proper, had prescribed by the expiration of the four years which the law provides for its commencement, which period of time is the same as that fixed for the rescission of partitions.

In view of all the foregoing this appeal must be dismissed and the judgment rendered by the District Court of San Juan on May 24, 1910, affirmed.

*Affirmed.*

Justices MacLeary and del Toro concurred.

Mr. Justice Wolf signed stating that he concurred in the judgment and in the opinion except as to the discussion of prescription.

Mr. Justice Aldrey did not take part in the decision of this case.